# NOVEMBER, 1917

Ex Parte Dabney White.

No. 3761.   Decided November 17, 1915.

(The opinion reached Reporter November, 1917.)

**1.—Warehouse and Marketing Law—Caption of Act—Constitutional Law.**

The Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, does not contain more than one subject, which is expressed in the title of the Act, and is therefore not violative of the provision of section 35, article III of the Constitution of Texas.

**2.—Same—Constitutional Law—Fourteenth Amendment.**

The Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, is not violative of the provision of the Fourteenth Amendment of the Constitution of the United States, nor of section 17, article 1, of the Constitution of Texas.   Davidson, Judge, dissenting.

**3.—Same—Constitutional Law—Equal Protection of the Laws.**

The Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, is not violative of section 1 of the Fourteenth Amendment to the Constitution of the United States, which provides that no State shall deny to any person within its jurisdiction the equal protection of the laws.   Davidson, Judge, dissenting.

**4.—Same—Police Power—Constitutional Law.**

The Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, was rendered necessary for the promotion and preservation of the public welfare, and its provisions are reasonable and calculated to correct the evils intended to be corrected, and therefore it violates no provision of the Constitution of the United States or of the State of Texas. Davidson, Judge, dissenting.

**5.—Same—Rule Stated—Police Regulations.**

The power of the State to impose restraint and burdens upon persons and property in conservation and promotion of the public health, good order and prosperity, is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States and essentially exclusive. Following In re Rahrer, 140 U. S., 554, and other cases.

**6.—Same—Case Stated—Cotton Gins—Marketing.**

Where the evidence adduced on trial demonstrates that there are evils connected with the ginning of cotton that imperatively demand regulation, the Legislature was justified to pass the Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, to relieve those often recurring periods in which the entire citizenship is seriously affected. Davidson, Judge, dissenting.

**7.—Same—Case Stated—Police Power—Ginning and Marketing Cotton.**

The evidence in the instant case shows that the general public in this State is so affected by the heretofore existing system of the preparation of cotton for the market, and the system of marketing the same as to authorize the Legislature under the police power of the State to correct these evils, and the Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, is valid and constitutional. Davidson, Judge, dissenting.

**8.—Same—Rule Stated—Caption of Act.**

Only the general or ultimate object is required to be placed in the title of the Act and not the details by which the object is to be attained, and any provision calculated to carry the declared object into effect is admissible. Following Johnson v. Martin, 75 Texas, 33, and other cases.

**9.—Same—Rule Stated—Caption of Act—One Subject.**

This provision of the Constitution, section 35, article III, prohibiting more than one subject in the caption of the Act does not apply where two matters are incorporated in the Act which are germane to each other and parts of the same general matter. Following McMeans v. Finley, 88 Texas, 521, and other cases.

**10.—Same—Discrimination—Cotton Gin—Public Ginner.**

Where a ginner in addition to the ginning of the cotton raised by himself also gins the cotton of his tenants he would be brought within the definition of a public ginner as defined by the Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, and as it applies to all men who engage in the business of ginning cotton in this State and there is no discrimination between two different classes of men following the same occupation in this State, the Act is valid. Davidson, Judge, dissenting.

**11.—Same—Police Power—Fraudulent Practices—Cotton Samples.**

By the Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law, the ginner is compelled to deposit one of the three samples taken from the cotton as it is ginned with the ginner, delivering the other two to the owner, or one to the warehouse. This is done to prevent fraudulent practices, and is not violative of any provision of the Constitution of the United States or of the State, and is therefore valid. Davidson, Judge, dissenting.

**12.—Same—Retaxing Costs—Habeas Corpus.**

Under article 210, C. C. P., the court can award the costs against either or both the parties in the case, and may therefore retax costs as it deems proper, which is here done.

From Smith County.

Original habeas corpus proceeding asking discharge of relator from arrest under the Act of the Thirty-third Legislature, Second Called Session, known as the Warehouse and Marketing Law.

The opinion states the case.

*H. M. Wade, N. B. Morris,* and *N. A. Stedman,* for appellant.—On question of caption of the Act: Adams & Wickes v. Water Co., 86 Texas, 485; Provident Life & Trust Co. v. Hammond, 79 Atl. Rep., 628; Ward Cattle Co. v. Carpenter, 168 S. W. Rep., 408; M., K. & T. Ry. Co. v. State, 102 Texas, 153; Ballentine v. Wickersham, 75 Alabama, 533.

On question of violation of Fourteenth Amendment: Powell v. Pennsylvania, 127 U. S., 678; Dobbins v. Los Angeles, 195 U. S., 223; Mehlos v. Milwaukee, 146 N. W. Rep., 882; Smith v. Texas, 233 U. S., 630; Chicago, B. & Q. Ry. Co. v. Chicago, 166 U. S., 226; Allgeyer v. Louisiana, 165 U. S., 578; Reagan v. Farmers Loan & Trust Co., 154 U. S., 362; Ex parte Haydn, 82 Pac. Rep., 315; Turner v. Maryland, 107 U. S., 38; Munn v. Illinois, 94 U. S., 113; Bud v. New York, 143 U. S., 517; Sinking Fund Cases, 99 U. S., 700.

On question of class legislation: G., C. & S. F. Ry. Co. v. Ellis, 165 U. S., 150; Yick Wo v. Hopkins, 118 U. S., 356; Cotting v. Goddard, 183 U. S., 79.

*B. F. Looney,* Attorney General, *C. C. McDonald,* Assistant Attorney General, *A. U. Puckett, Alexander, Baldwin & Ridgway, C. F. Greenwood,* and *C. M. Cureton,* Assistant Attorney General, for the State.—On question of police power: Jannin v. State, 51 S. W. Rep., 1126; Waters-Pierce Oil Co. v. State, 44 S. W. Rep., 936; Railway Co. v. Dwyer, 12 id., 1001; Quillin v. Smye, 50 id., 1068; Ex parte Hughes, 100 S. W. Rep., 160; Solon v. State, 114 S. W. Rep., 349; Powell v. Penn, 127 U. S., 678; Holden v. Hardy, 169 id., 366; Railway Co. v. Beckwith, 129 id., 29; Slaughter House Cases, 83 U. S., 36; Knoxville Iron Co. v. Harbinson, 183 U. S., 13.

Act not violative of Fourteenth Amendment: Ex parte Denny, 129 S. W. Rep., 1115; Brown v. Galveston, 97 Texas, 1; Ex parte Wilson, 56 Texas Crim. Rep., 1; Ex parte Gregory, 20 Texas Crim. App., 210; Ex parte Smith, 132 S. W. Rep., 607.

*Alexander, Baldwin & Ridgway,* general attorneys, for Farmers Union of Texas.—On question of caption of Act: Ex parte Abrams, 56 Texas Crim. Rep., 465, 120 S. W. Rep., 883; Nichols v. State, 32 Texas Crim. Rep., 391; Joliff v. State, 53 id., 61; Ex parte Segars, 32 id., 553, and cases cited in opinion.

On question of police power: Ex parte Townsend, 64 Texas Crim. Rep., 350, 144 S. W. Rep., 628; Hatcher v. City of Dallas, 133 S. W. Rep., 914, and cases cited in opinion.

HARPER, Judge.—Relator was arrested, the complaint charging

that he was "a licensed and bonded ginner, conducting and operating a public gin in Smith County, Texas, and did then and there, as such licensed and bonded ginner, gin a bale of cotton for one J. C. Burt, and did then and there knowingly and wilfully fail to take three true and correct samples of said bale of cotton so ginned, as required by law, and did then and there knowingly and wilfully fail to preserve such samples of said bale of cotton so ginned by him, as required by law."

Immediately upon being arrested, relator made application to this court for a writ of habeas corpus, and, as it was apparent that the only question involved was the constitutionality of chapter 5, Acts Thirty-third Legislature, Second Called Session, the writ was granted, and the cause set down for a hearing. At the hearing a great deal of testimony was adduced, able oral arguments made, and exhaustive briefs filed both by attorneys for the relator and attorneys for the State. We have read these briefs with pleasure and profit, and they have been of material aid to us in passing on the questions involved. Of course, no provisions of the law are involved in this case except those provisions regulating gins and the ginning of cotton, and we shall narrow the discussion down to those provisions, except in the particular that is claimed the law deals with two subjects, and is, therefore, violative of the provisions of section 35 of article 3 of the Constitution, which provides that, "No bill shall contain more than one subject, which shall be expressed in the title." If this contention should be sustained, of course the whole Act would be invalid, but if the law has but one general object or subject, which is fairly indicated by its title, and the statute or Act in question deals only with matters related directly or indirectly to the main subject, or object to be accomplished, and the matters dealt with by the terms of the Act have a mutual connection, are not foreign to the subject dealt with, and are necessary to the accomplishment of the purpose of the Act, the Act would not be dealing with two subjects, and in such an event only the question of the validity of the provisions relating to gins and ginners would come under review in this case.

The first contention of relator is, that the title and the body of the Act contain two subjects, not germane to but independent of each other, namely, the creation of a bonded warehouse system, and the establishment of a system for the regulation of gins and ginners, and that the title of the Act refers to "all gins" while the body of the Act refers to only "public gins," and, therefore, the subject expressed in the title is not the same as that expressed in the body of the Act.

The second and fourth contentions are, that the Act is violative of the provisions of the Fourteenth Amendment of the Constitution of the United States, which provides that no State shall deprive any person of life, liberty or property, without due process of law; and is violative of section 17, article 1, of the Constitution of this State, which provides that, "no person's property shall be taken, damaged or de-

stroyed, or applied to public use without adequate compensation being made, unless by the consent of such person."

And third, that the Act in question, in so far as it relates to gins and ginners, is violative of section 1 of the Fourteenth Amendment to the Constitution of the United States, which provides that "no State shall deny to any person within its jurisdiction the equal protection of the laws."

These four are the propositions stated and relied on by relator, although in presenting them a rather wide range is taken in the argument. Relator, in his brief, lays down some general rules that we can and do endorse, namely: "The law under consideration can be defended, if defensible at all, upon the theory that it was enacted in the exercise of the police power of the State for the common good or general welfare. Without attempting an accurate definition of the police power, we are well within the legal conception of the term when we speak of it as the power of the State to enact laws for the promotion of the public health, the public safety, the public morals, the public peace or order and the public welfare. Whether legislation is justified by reference to the preservation or promotion of the public health, safety, morals or peace, is usually not difficult of determination, but whether it is justified by the preservation or promotion of the public welfare is necessarily, by reason of the generality of that expression, a question, in many situations, of more or less perplexity. . . . While the police power may be exerted for various purposes, among them being the promotion of the public welfare, the foundation of the doctrine is deeper, since, as expressed in the License Cases, 5 How., 504, 583, 'they are nothing more nor less than the powers of government inherent in every sovereignty to the extent of its dominions.' We refer to this view of the basis of the police power, in order to correct a misapprehension, which has been responsible for a radically erroneous conception of the extent of the power. The language above quoted from the license cases is quoted by the court in Lake S. & M. S. Ry. Co. v. Smith, 173 U. S., 684 (L. Ed., 858), but the court was careful to add the following: 'This power must, however, be exercised in subordination to the provisions of the Federal Constitution. If, in the assumed exercise of its police power, the Legislature of a State directly and plainly violates a provision of the Constitution of the United States, such legislation would be void.' To the same effect is N. O. Gas Light Co. v. Louisiana Light Co., 115 U. S., 650, where the court said: 'Definitions of the police power, however, must be taken subject to the condition that the State can not in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land.' It is only the legitimate exercise of the police power that is not abridged by the Fourteenth Amendment, as is indicated by the following taken from the case of Powell v. Pennsylvania, 127 U. S., 678 (L. Ed., 253): 'It is scarcely necessary to say that if this statute is a legitimate exer-

cise of the police power of the State for the protection of the health of the people, and for the prevention of fraud, it is not inconsistent with that amendment.' The necessary implication from this proposition is, that if the legislation does not come within the legitimate exercise of the police power, it must be rejected as violative of the Fourteenth Amendment. In other words, if legislative action is not the legitimate exercise of the police power, the Fourteenth Amendment interposes a fatal objection, since, otherwise, the very, safeguards intended to be provided by the amendment would be destroyed. Differently stated, if, when the Legislature transcends the limits of the lawful exertion of the police power, the guaranties of the Fourteenth Amendment will not avail for protection, the Constitution of the United States ceases to be the supreme law of the land, and its guaranties are meaningless and impotent. Still, notwithstanding the clearly settled law, that the police power must be exercised in subordination to the provisions of the Federal Constitution, we find now and then the statement in a decision that the provisions of the Federal Constitution impose no restraint upon the police power of the State. This expression of the law, due to a misconception of the scope of what is called the sovereignty of the State, without explanation, is seriously misleading. If a legislative enactment is reasonably adapted to the attainment of any one of the ends of promoting the public health, safety, morals or peace, or the public welfare, it comes within the legitimate scope of the police power, and in that condition it does not infringe any provision of the Federal Constitution. But if the element of reasonable adaptation to the accomplishment of one of these purposes is lacking, it is not the lawful exercise of the police power, and, therefore, runs counter to the Constitution and must fail. The doctrine on this subject is well expressed in McGehee on Due Process of Law, on page 306, as follows: 'A general limitation on the exercise of the police power is found in the idea of reasonableness; that is, to be valid a statute must be reasonable and enacted in good faith; for every merely capricious and arbitrary fiat of the Legislature is out of place in "a government of laws and not of men," and is irreconciliable with the conception of due process of law.' The same author on the next page makes this declaration: 'The police power can not be interposed to support statutes which have no possible tendency to protect the community or promote the public welfare, but which, having no substantial relation to the public welfare, arbitrarily deprive the owner of liberty or property.' The cases sustaining these views are numerous, and out of the number we select a few extracts. Thus in Mugler v. Kansas City, 123 U. S., 623 (L. Ed., 205), it is said: 'It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State. There are of necessity limits beyond which legislation can not rightfully go. While every possible presumption is to be indulged in favor of the validity of the statute, Sinking Fund Cases,

99 U. S., 718, the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. "To what purpose," it was said in Marbury v. Madison, 5 U. S., 1, Cranch, 137, 167, "are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation." The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.' And in Dobbins v. Los Angeles, 195 U. S., 223 (L. Ed., 169), we find: 'It may be admitted that every intendment is to be made in favor of the lawfulness of the exercise of municipal power, making regulations to promote the public health and safety, and that it is not the province of courts, except in clear cases, to interfere with the exercise of the power reposed by law in municipal corporations for the protection of local rights and the health and welfare of the people of the community. But notwithstanding this general rule of the law, it is now thoroughly well settled by decisions of this court that municipal by-laws and ordinances, and even legislative enactments undertaking to regulate useful business enterprises, are subject to investigation in the courts with a view of determining whether the law or ordinance is a lawful exercise of the police power, or whether, under the guise of enforcing police regulations, there has been an unwarranted and arbitrary interference with the constitutional rights to carry on a lawful business, to make contracts, or to use and enjoy property. In Lawton v. Steele, 152 U. S., 133-137, Mr. Justice Brown, speaking for the court, said upon this subject: "To justify the State in thus interposing its authority in behalf of the public it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts." ' "

We have copied the above excerpt from relator's brief as expressing the law applicable to the police power of the State, and to demonstrate that relator recognizes that if the law was rendered necessary for the promotion and preservation of the public welfare, and its provisions are reasonable and calculated to correct the evils intended to be corrected, such law would violate no provision of the Federal Constitution. For as said by the Supreme Court of the United States in In re Rahrer, 140 U. S., 554, speaking through Chief Justice Fuller:

"The power of the State to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order and prosperity, is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive. And this court has uniformly recognized State legislation, legitimately for police purposes, as not, in the sense of the Constitution, necessarily infringing upon any right which has been confided expressly or by implication to the national government."

Has experience demonstrated that there are evils connected with the preparation of cotton for market, and the marketing of same which affect the State as a whole—the general public welfare? If so, then under the authorities quoted by relator the State, in seeking under the police power, to correct and remedy those evils, would not and can not be held to violate any provision of the Federal Constitution. Cotton is not only the chief product of this State but of the entire South, and not only "within the memory of man" but at the very time of the enactment of this law, all the industries of this State and of the South were paralyzed by conditions affecting the cotton crop. The farmer, the merchant, the bank, the lawyer, the doctor, in fact, the entire citizenship of this State, was brought almost to the door of the bankrupt court by conditions affecting the marketing of cotton, and the conditions were such that not only authorized but imperatively demanded that the Legislature enact laws remedying or tending to remedy those conditions if within the power of legislation to do so. No one can gainsay that a condition existed in which the public welfare was vitally interested and the whole public affected, and relief from such conditions provided, if it was possible to do so. And the instance of the conditions of the year 1914, while impressing the necessity for legislation to avoid and prevent such conditions from again arising, is not the only instance in which the conditions affecting the cotton crop has about paralyzed the entire industries of the State and South. All of us can remember that but a few years ago cotton was selling at from four to six cents per pound (much less than the cost of production) and that many failures in business were occasioned thereby, and almost starvation brought to the doors of many. In fact, every legitimate interest and business in our State were affected thereby. It has been demonstrated, and we think fully shown by the evidence in this case, that such conditions were not the result of the law of supply and

demand, but were brought about by conditions which can, in a measure at least, be remedied by suitable legislation, and this is the object and purpose of the legislation involved in this case. It may not accomplish all that can be accomplished; it may be defective in many particulars, but this does not affect the power of the State to enact legislation of this character if the public welfare demands legislation to remedy the conditions which, at various and sundry periods of our history, brought about the injury of the citizenship of the State as a whole, and which certainly affected not only the welfare of the farmers, the producers of cotton, but as well seriously affected the welfare of every citizen of the State engaged in any legitimate calling, trade or profession. But it may be contended, that these conditions were conditions in no way brought about or contributed to by the ginners, in ginning the cotton, yet, even if that were true, if it became imperatively necessary to regulate the ginning of the cotton by suitable legislation, to remedy the evils which had brought about such conditions, this would authorize the Legislature to regulate the ginning to accomplish the purpose sought, if it was necessary to do so. The evidence adduced on this trial, we think, demonstrates there are evils connected with the ginning of cotton that imperatively demanded regulation, else no legislation could be adopted which would enable the Legislature to adopt a system which would relieve or tend to relieve those oft recurring periods in which the welfare of the entire citizenship is seriously affected. It was shown by the evidence that it has grown to be the custom with virtually all ginners to "plate" each bale of cotton ginned, with a portion of the cotton of the previous bale ginned. Col. Sheb Williams, in his testimony, aptly illustrates how this is done by the ginners in order that they may gin more cotton each day. There is what is termed a "roll" that must be filled before the gin can be run at its regular speed. He testified: "You must first fill your roll before you can properly gin cotton. If I should bring a bale of cotton to the gin and the roll was filled from that bale, a good bale, just when the box and feeders were clear, this would be shut off, and in order to keep the roll tight with the lint that may be taken from the seed, now the bale of cotton succeeding me of necessity would get the lint from the seed that this roll ginned, and that would go into the succeeding bale. If the succeeding bale were a better one than this roll, that side of the cotton would, of course, be worse than the sample and better than the cotton actually was. In other words, it would be plated." This is shown to be the general custom of the ginners of this State; and then by the testimony of Mr. D. C. Reed, a cotton buyer, called as a witness by relator, it is shown that the buyers, under conditions heretofore existing, took a sample from each side of the bale of cotton, and bought by the sample that *graded the lowest.* This is but human, and we censure no one for doing so. So if the plate was of a superior grade, the farmer would not get the benefit by reason thereof, but if the plate was of *an inferior grade,* then the farmer sold his cotton by the inferior

grade and consequently lost thereby. So it may be said, through no fault of the raiser of the produce, he sells at least a portion of his crop by an inferior sample, occasioned by the fact that the ginner does not clean his roll and put all of a man's own cotton in his bale,—in lieu thereof placing a portion of the preceding man's cotton in each bale, and at the place where the sample is taken from the bale under former conditions. This should be remedied, and this the law seeks to do by prohibiting the "plating" of cotton, and providing for the taking of samples as the bale is ginned.

Again, the evidence before us shows that there are at least a few ginners—they being the exception and not the rule, we will say in justice to the ginners—while ginning cotton to so arrange a steam cock or valve that steam would escape and spray the cotton while being ginned, thus adding to its weight. This was done to bring customers to their gin—giving an extra large "turn-out." This was an evil that needed correcting, and this the law attempts to remedy. This and other matters incident to the way the cotton was ginned and baled had caused what is termed an "overhead charge" to be made by the spinners against each bale of cotton, amounting to thirty pounds on each bale of cotton of five hundred pounds. It is known, and the evidence before us shows, that the bagging and ties on each bale of cotton weighs from twelve to twenty-two pounds—that the average weight of bagging and ties would probably be from eighteen to twenty pounds per bale, and yet the "tare" or "overhead charge" has been fixed at thirty pounds, thus penalizing every bale of cotton from ten to twelve pounds, amounting, at the present price of cotton, at from $1.10 to $1.30 per bale, which the producer loses by reason of this "overhead" or "tare" charge. This was occasioned, in the main, by reason of loss from spraying the cotton, mixed packed, sand-packed and water-packed cotton, all of which can, and, under this law, should be, and if properly enforced will be, prevented by the ginner in ginning the cotton. Under the system heretofore existing, as shown by the testimony of Mr. Reed, the buyers who ship the cotton to the spinners know there is an overcharge on every properly ginned bale of cotton of at least ten to twelve pounds that should not be made, consequently when the buyer is having the cotton compressed for shipment he has what is termed "patches" put on the cotton, additional bagging, old sacks, or something of similar character, to the extent of ten or twelve pounds, and then bills his cotton out as weighing this much in addition to the weight on which he purchased it. If he purchased a bale, by weight of 500 pounds, when he ships and the "patches" have been put on he bills it as weighing 510 or 512 pounds, and for this reason the "tare" or "overhead" charge will not be reduced by the spinners under former conditions. Mr. Reed frankly testified that he could buy cotton at eleven cents a pound and sell it to the spinner at the same price—eleven cents a pound—and make from a dollar to a dollar and a quarter a bale—by reason of these "patches" being placed thereon, and by reason of the

further fact that if the cotton as billed to the spinners comes to within one per cent of the billing, there is no reduction, thus giving another margin of five pounds that can be added to the weight in shipping over and above the weight as purchased. This makes it apparent that while a bale of cotton weighing 500 pounds is sold on the market here as weighing only 470 pounds,—that is, the price is fixed so that is the number of pounds paid for, yet in selling the cotton to the spinner it is sold as weighing 485 pounds,—half the tare, or fifteen pounds, being taken advantage of by the purchaser who sells to the spinner. We are censuring no one, but this evidences a condition that needs remedying, and this the Legislature has sought to remedy by this bill. In addition to this, the evidence before us shows that by cutting the bales and taking out samples, by what is termed "picking the cotton" at the cotton yards and compresses, there is annually what is termed a "town or city crop" of one hundred thousand bales. And this is marketed and sold by men who did not raise a pound, nor even a single lock of cotton. All this is taken into consideration in fixing the "tare" or "overhead" charge as against each bale of cotton. If a bale is completely covered by the bagging, or wrapping placed on cotton, and it is not necessary to cut the bagging to obtain a sample, all this one hundred thousand bale town or city crop will disappear and the "overhead" charge or "tare" can be reduced proportionately. This is one of the reasons shown why the "sample" should be taken while the cotton is being ginned, instead of the bagging being cut on each side and samples taken after being baled. Again it is shown by the evidence before us, that the place where the bagging is cut and samples pulled out of each side, will form a cup, so when it rains these cups will fill with water and form what is called by cotton men "a cancer," which continually eats its way into and some instances entirely through the cotton, rendering a number of pounds of cotton valueless, and this is taken into consideration in fixing the "overhead charge"—all of which is a loss to the producer, for it is taken into consideration in fixing the price.

But it was insisted on behalf of the relator, that cotton after being pressed gives a better "sample" than when taken as the cotton is ginned. There is but one instance in the evidence before us, and that shows the sample when taken as being ginned and one taken out of the same bale after being baled, was exactly the same—there being no difference. But by some of the testimony it was shown that cotton after being baled took on what was termed a "bloom" that it did not have while being ginned. This adds nothing to the length or strength of the fiber, nor to the cotton in any way according to the testimony, but if it did cause the cotton sample to grade better, the testimony before us would show that when the sample is taken as ginned and placed in a sealed receptacle, the same "bloom" comes upon the sample, and if it added anything to the grade of the cotton, it would be upon both samples, when taken when being ginned, or when taken after being baled. There

was testimony that the buyer could not rely upon the sample when taken as ginned and placed in a sealed receptacle, for it was said the first purchaser who bid on it when it was opened might get a correct view of the sample, yet in carrying it to different cotton buyers, and handled by them, the dirt and trash might be shaken out. If so, the buyer would be at no greater disadvantage than formerly, for if the bagging was cut and a sample taken from the side, the first buyer who bid on it would see the sample just as taken from the bale, but when the producer carried the sample thus taken to the different buyers the dirt and trash would be shaken out in the one instance as well as in the other, and we all know it is not customary for each buyer who bids on cotton to take a sample out of the bale, for if they did the bale would soon become almost all "samples." We have mentioned these matters to show why we think the evidence in this case demonstrates that the general public in this State is so affected by the heretofore existing system of the preparation of cotton for the market and the system of marketing the same as to authorize legislation under the police power of the State to correct the evils, and to show that there were evils connected with the ginning of cotton which, under this power and authority, to authorize the Legislature to enact a law to remedy the evils that have grown up and become a part of the system of ginning cotton heretofore carried on in this State. To our mind there is and can be no question that the public welfare demands the eradication of these evils, that legal fraud may be prevented, that unnecessary overhead charges may be eliminated, and the staple crop of the State, upon which the prosperity of each and every citizen of the State, in a measure, more or less depends, may not be thus penalized and sacrificed by being forced on the market in a few months' time. To remedy these conditions the law was passed, and the State had the authority to pass it under its police power, inherent in sovereignty, and which was not ceded to the Federal government, and the law, in none of its provisions, is obnoxious to the Fourteenth Amendment, or any other provision of the Federal Constitution.

But does the law embrace two subjects in its provisions? Does it deal with two wholly unrelated subjects? If so, of course it is invalid, even though it is obnoxious to no provision of the Federal Constitution. That the caption is broad and comprehensive enough to embrace all the provisions of the Act is conceded, but it is insisted that by the caption itself, as well as the body of the Act, it is manifest that the law deals with two wholly unrelated subjects—the ginning of cotton and the warehousing of cotton. It does deal with both, and this is placed beyond question both by the title and the body of the Act. But does the ginning of cotton and warehousing of cotton, either or both, express the subject or object of the legislation in question? We think, taking into consideration the conditions known to exist at the time of the passage of the Act, the caption and the whole body of the Act, the ginning of cotton and the warehousing of cotton, are but incidents to

the main purpose sought to be accomplished by the law. The "subject" of the law, the object and purpose of the law, was to so gin and prepare the cotton for market, to protect the cotton until marketed, that it could be marketed without the loss heretofore incident and growing out of the system heretofore existing in ginning and in keeping or holding cotton until it was finally marketed. The Legislature had in mind the enormous loss entailed upon the chief product of the State annually, and which affected every individual in the State either directly or indirectly, as hereinbefore shown, first, by the product being forced on the market within three or four months, and to prevent this. to provide a system or means by which the necessity for this might and could be removed; the loss incident to this product if held, by being exposed to the weather, and to provide a means to remedy and remove this evil that it might be held without loss or injury; and third, to enable the farmer to hold it, and not be forced to sell it as soon as gathered. After having provided a means for it to be kept without damage, there were evils connected with the ginning of cotton that must be remedied. To enable the Legislature to accomplish the "subject" or purpose of the law, which was simply to prevent the sacrifice of our annual cotton crop, and is a subject in which each and every citizen of the State is either directly or indirectly interested it was necessary to regulate the ginning to prevent fraud and fraudulent practice. The purpose of the law is a "big subject," but each and every provision of the Act is necessarily incident to and connected with the accomplishment of the object and purpose of the law. We know that there are many families in this State, men who raise cotton on the half plan, or pay one-fourth of the crop for the rent of the land, that were and would be necessarily compelled to sell their cotton as gathered, if some system of legislation was not passed under and by virtue of which they would not be compelled to do so. Mankind generally is aware of the fact that this could not be accomplished unless some system was adopted whereby it would be properly ginned and housed while being held until marketed. This system or act was adopted to accomplish the purpose of preventing the entire cotton crop being forced on the market in the few months while being harvested, and sold at a loss. Conditions arose at times that forced a sacrifice of this crop if it was forced on the market in these few months. Every citizen and every industry in the State was and is so entwined in the proper marketing of this crop, and preventing its sacrifice, as to make it a matter that affects the general welfare of the whole State and each and every citizen thereof. By the system of ginning, weighing, sampling and housing of the cotton provided for under the provisions of this law, a way and means is provided where the cotton crop need not be forced on the market at a sacrifice in times when war renders it impracticable to sell it, or when financial stringency renders it practically impossible to obtain the means to finance it, or any other condition arises which

renders it impracticable or impossible to sell it without sacrifice as fast as it is harvested.  The main subject and principal object of this law is to prevent the losses annually occurring in the marketing of this crop,.and the proper ginning and warehousing of cotton is not only incident but absolutely necessary to the accomplishment of the purpose of the law, and but for which the general welfare of the public might not perhaps be so entwined in the "subject" of the law as to call into and demand the application of the police power to the subject legislated upon.  Our Supreme Court has declared, in passing on section 35 of article 3, that "only the general or ultimate object is required to be placed in the title and not the details by which the object is to be attained.  Any provision calculated to carry the declared object into effect is admissible.  (Johnson v. Martin, 75 Texas, 33; Doeppenschmidt v. Railway Co., 100 Texas, 532; Synder v. Compton, 87 Texas, 378; T. & P. Ry. Co. v. Stoker, 102 Texas, 60; Newman v. Williams, 46 Texas Civ. App., 467.  And this court has announced the same rule in Ex parte Abrams, 56 Texas Crim. Rep., 465.  In Breen v. State, 44 Texas, 305, our Supreme Court held:  "It is a sufficient compliance with this provision of the Constitution if the law has one general object which is fairly indicated by its title, though it may embrace different subjects which are connected with or appropriate for the accomplishment of this general object or purpose."  In Snyder v. Compton, 87 Texas, 377, the court says:  "Any provision calculated to carry the ·declared object into effect is unobjectionable.  And where all the provisions of an Act are subsidiary to and legitimately connected with and tend to effect and enforce its main object, the law is not subject to the objection that two subjects are embraced in the title.  Ornick v. City of Fort Worth, 52 Texas Civ. App., 309; (Railway Co. v. State, 97 Texas, 731) ; Ex parte Hernan, 45 Texas Crim. Rep., 343; Snyder v. Compton, 87 Texas, 378.  In McMeans v. Finley, 88 Texas, 521, the Supreme Court holds:  "This provision, prohibiting more than one subject, does not apply where two matters are incorporated in the Act which are germane to each other and parts of the same general matter."  Many other decisions holding that an Act of the character under discussion is not violative of section 35 of article 3 of our State Constitution, will be found collated under this section in Harris' Ann. Constitution, pages 253 to 273.  But it is insisted that as the title of the Act refers to "all gins," and the body of the Act refers only to "public gins," that the title is broader and more comprehensive than the body of the Act.  We carefully listened to every word of the testimony that fell from the lips of the witnesses, and have re-read the testimony while considering this case, and under this testimony there are no gins in Texas that do not properly come within the definition of "public gins" as defined in the Act.  The only testimony that would even suggest the thought that there might be gins in Texas not coming within the definition of "public gins" in the Act, was the testimony of relator and Senator Astin on this point.  Mr. White testified that

he thought perhaps that one-fourth of our cotton crop was ginned by men who had raised the cotton or purchased by them before it was ginned. But when asked if he could name one ginner who ginned cotton for himself alone, or who did not gin for the public, he could not name such gin. So if one-fourth of the cotton ginned was owned by the men who ginned it, the evidence would show they, while ginning their own, also ginned for others, and would come within the provisions of the law. Senator Astin testified that there were gins in the Brazos bottom which sought no customers except the cotton raised by the planter himself, and not raised by tenants on the farm of the owner of the gin. But if, as testified to by him, the ginner in addition to ginning the cotton raised by himself also ginned the cotton of his tenants, he would be brought within the definition of a "public ginner," as defined in the Act. So whether we refer to the title or the body of the Act, it applies to all men who engage in the business of ginning cotton in this State, and there is no discrimination between two different classes of men following the same occupation in this State. All ginners who have heretofore ginned cotton, preparing it for the market, in this State, would and do come within the provisions of the law. And it is hardly possible, and would not be practicable, for a man in the future to go to the necessary expense of purchasing and erecting a gin, to gin alone the cotton he might alone raise.

The expense necessary and incident to the ginner complying with this law was variously estimated by the witnesses at from three cents per bale to twenty-five cents per bale. It was shown of some seven hundred gins inspected by the inspectors provided for by the law, only about one-fourth of that number were making any extra charge in ginning cotton, and the one-fourth who did make an extra charge, charged on an average of about twenty-five cents per bale. The expense testified to by Mr. White was that in a gin ginning thirty or more bales of cotton per day, the services of an additional man would be required; that three wrappers cost from one-half cent to one cent each, or from one and one-half cents to three cents per bale; that scales to weigh the samples would necessarily be required to be purchased, and the scales would cost about twelve dollars; that scales to weigh the cotton after it was baled would cost about forty dollars. This is all the additional expense testified to by any witness, and relator contends that this is a taking of his property without due process of law. If the evils growing out of and connected with ginning cotton has rendered it necessary to regulate the business to eliminate the plating of cotton, to prevent the spraying of cotton, to prevent the sand-packing of cotton, and the other evils testified to by witnesses, that the law necessarily fastened this extra charge on the business of ginning cotton, would not render the law obnoxious to the Federal or State Constitution. There is many a charge made or license fixed that must be paid or endured necessarily for the public welfare under the laws of this State, and of every State in this Union. But is such a charge neces-

sarily fixed on the ginner? The testimony shows that many ginners do, and all could make a charge under the law to cover this extra expense. So the ginner is not necessarily deprived of any property by the law. If he does not gin for the public, and that is not his business, he has no such expense. However, we have no such gins in this State. If he does follow the business or occupation of ginning for others and suffers any loss, he voluntarily does so, for the law forces no expense without allowing him compensation if he sees proper to charge it for performing the duties required by the law. But take Mr. White's estimate of the expense, what does it amount to per bale. If one gins as much as thirty bales per day he must employ an extra man at a cost of $70 per month. Thirty bales per day, twenty-six working days, aggregate 780 bales per month, or about nine cents per bale; the best wrappers, the testimony shows, cost one and one-half cents per bale, and adding both together, ten and one-half cents per bale. All gins already had scales for weighing the bales after being ginned, and the scales for weighing the samples would last for years, and the cost per bale incident to the purchase of such scales would be infinitesimal, but say one-half cent per bale, and the cost, under the testimony, where an extra man is employed would not exceed eleven cents per bale, and under all the testimony, both for the State and relator, it is shown that if the provisions of the law are complied with the price received for the bale of cotton would be enhanced not less than $5 per bale, and the man who has the cotton ginned could well afford to pay the eleven cents per bale out of the $5 additional received—if the ginner saw proper to make the additional charge. At any rate, there is no taking of the property of the ginner within the meaning of the Fourteenth Amendment to the Constitution of the United States, and there is not any violation for that reason.

Neither do we think there is taking of the property of the farmer or producer without due process of law, within the meaning of the Fourteenth Amendment to the Federal Constitution, or the taking of his property without compensation under section 17 of article 1 of the State Constitution by requiring a sample of five and one-third ounces to be deposited with the ginner. We doubt very seriously whether or not a ginner is in position to raise the question that the law would be invalid for the reason that it takes the property of the farmer, for if it did do so it would not be the taking of any property of the ginner. (Sweasy v. Webb, 76 S. W. Rep., 266; Bertram v. Commonwealth, 62 S. W. Rep., 969; M., K. & T. Ry. Co. v. Cade, 233 U. S., 642; Erie Railway v. Williams, 233 U. S., 685.) But we will not rest our decision upon that ground, and will consider it on the theory that the producer must bear, or can be made to bear under the law the eleven cents per bale expense additional to the ginner by the provisions of the law, if it shall be so much, or whatever it may be, and in addition thereto he will be deprived of five and one-third ounces of his cotton, required by law to be deposited with the ginner. At present prices

this would figure about four cents, or a total of fifteen cents per bale—
that the producer under the provisions of the law would be finally
deprived of by the Act, yet under all the testimony, if the law is com-
plied with and the system is carried out, he will receive in addition to
the amount heretofore received $5 per bale. There are but few, if
any, men who would object to the regulation of the preparation of his
product for market, at so small an expense, if the price he received
would be enhanced in so much greater sum than that taken,—he would
deem it adequate compensation for the property taken. But if the
evils exist, as shown by the testimony adduced on this hearing, the
State under its police power has the authority to correct these evils.
But is this a loss to the farmer, or a taking of his property? Under
the system heretofore existing when a farmer carried his cotton to
market, two samples were taken from the cotton,—one from each side
by the spinner buyer. It was "picked" at the cotton yard and com-
press to the amount of one hundred thousand bales annually. This
loss the provisions of the law seek to eliminate. In addition to this,
when the farmer carried his cotton to the cotton yard or warehouse
under the old system, he had to pay to have it weighed. This re-
weighing is no longer necessary, for any and all buyers would rather
purchase by the ginners' weight, which is certified to be correct, and
which he has given a bond to insure, and which bond is liable if in-
correctly weighed. This saving will alone compensate the farmer and
producer for the ten or fifteen cents additional charge, if so much it
shall be, but which we are inclined to believe, under the evidence, will
not exceed a total expense of from five to ten cents per bale, including
the sample. This expense will, in our opinion, be less than the weigh-
ing charges heretofore and rendered unnecessary under this Act.

Judge Cooley, in his work on Constitutional Limitations, quotes with
approval from Chief Justice Shaw in the case of Commonwealth v.
Alger, 7 Cush., 53, as follows:

"We think it is a settled principle, growing out of the nature of
well-ordered civil society, that every holder of property, however abso-
lute and unqualified may be his title, holds it under the implied lia-
bility that his use of it shall not be injurious to the equal enjoyment
of others having an equal right to the enjoyment of their property, nor
injurious to the rights of the community. All property in this com-
monwealth is  .  .  .  held subject to those general regulations which
are necessary to the common good and general welfare. Rights of
property, like all other social and conventional rights, are subject to
such reasonable limitations in their enjoyment as shall prevent them
from being injurious, and to such reasonable restraints and regulations
established by law as the Legislature, under the governing and controll-
ing power vested in them by the Constitution, may think necessary and
expedient. This is very different from the right of eminent domain,—
the right of government to take and appropriate private property when-
ever the public exigency requires it, which can be done only on con-

dition of providing a reasonable compensation therefor. The power we allude to is rather the police power; the power vested in the Legislature by the Constitution to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise."

Again he quotes from the 97th U. S.; at page 25, as follows:

"General police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the State; of the power in the Legislature to do which no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned."

That laws may be passed under the police power to suppress fraud is too well established to need a citation of authorities. If a system had grown up whereby some ginners spray the cotton with steam to add to its weight, as testified to on this hearing, a legal fraud is perpetrated on the purchasers of the cotton, and this fraud affects the entire citizenship of the State and the public welfare, for by the testimony it is shown that the loss incident to this fraudulent practice is taken into consideration in fixing the price to be paid for all the cotton in overhead charges. And while this practice may not be indulged in by but a few ginners, one in the hundred or a less number, still the price of every bale of cotton grown and marketed in this State is affected thereby and reduced. Again, a legal fraud is practiced in the "plating" of cotton by the ginners, and each man's bale which is plated with an inferior grade of cotton to his own, is defrauded in that he must sell it on the sample as shown by this inferior grade, as shown by the testimony in this case, and the prevention of this alone will more than compensate the producers for the expense rendered necessary by the law. If the public welfare demands and authorizes the passage of such a law, that it adds a small additional expense to the preparation for market, and marketing of cotton, does not render the law unconstitutional, for this taking is not within the meaning of the constitutional provisions.

It was contended that the law was imperfect, in that it provided penalties as against the ginner, but no penalty as against the producer if he changed the "sample" placed thereon by the ginner and sold the cotton by a better and different sample. To prevent this fraudulent practice, it was rendered necessary that one sample should be deposited with the ginner and by him kept in a sealed package. This demonstrated the character of sample delivered to the producer on which to sell the cotton. If the producer should change this sample, and place a different sample in the receptacle and sell by this different sample, he would be knowingly and intentionally representing to the buyer

that the cotton was a better grade than that it really was, and this would render him guilty of swindling under the statutes of this State, and for which act the producer who did so could be severely punished. And by reason of the fact that a sample must be left with the ginner, the fraud or swindle would be easy of detection. For if when the bale was thoroughly examined it was found to correspond with the sample held by the ginner, and not to correspond with the sample that the producer sold the cotton by, this would be evidence that the producer had practiced a fraud by changing the sample, and render him subject to prosecution and punishment. And that is the reason why we suppose, and a sufficient reason why the law compels a deposit with the ginner of one of the three samples taken from the cotton as it is ginned. It is intended to and will prevent such fraudulent practices, if anyone was inclined to do so. And when it is necessary to prevent such fraudulent practices, and require that the article sold shall be of the same kind and character as the sample by which it is sold, that a sample thereof may be required of the seller is the settled law of this State, and has long been in force, without heretofore being questioned, or it being contended that such a provision is violative of any provision of the Constitution.

If this Act of the Legislature is to be struck down because one-third of a pound of cotton is taken from the bale and not returned to the owner, then other of our laws must likewise be declared unconstitutional.

Chapter 131, General Laws passed by the Thirtieth Legislature, section 4, provides:

"Before any concentrated feeding stuff so defined in section 3 of this Act is so offered or exposed for sale the manufacturer, importer or party who causes it to be sold or offered for sale within the State of Texas for use within this State shall . . . *deposit with said Director* (of experiment stations) *a sealed glass jar or bottle containing not less than one pound of the feeding stuff to be sold or offered for sale,* accompanied by an affidavit that it is a fair, average sample thereof and corresponds within reasonable limits to the feeding stuff which it represents, in the percentage of protein," etc.

The Thirty-second Legislature passed chapter 109, regulating commercial fertilizers and the sale thereof. Section 5 provides:

"The State Chemist shall cause one analysis or more to be made annually of such commercial fertilizer sold or offered for sale under the provisions of this Act as may be sampled under his direction. The State Chemist, in person or by deputy, shall have power to enter into any car, warehouse, store, building, boat, vessel, steamboat, or place supposed to contain fertilizers for the purpose of inspection or sampling, and shall have the power to take a sample for analysis, not exceeding two pounds, from any package or lot of fertilizer found within the State. Any person who opposes the entrance of said chemist or deputy, or in any way interferes with the discharge of his duty, shall be liable to a fine of not less than fifty dollars and not more

than five hundred dollars. Said sample shall be drawn by means of
a sampling tube of uniform diameter and at least eighteen inches long,.
placed in a jar or can, sealed and labeled by the inspector. Said sample
shall be taken from not less than five bags, but in lots of 100 and
over." . . .

Analyzing the foregoing excerpt from the law, it will be seen at
once that the State Chemist is given authority to enter upon the prem-
ises of any person engaged in the business to which the Act refers,
and it is made an offense for anyone to interfere with his effort to·
enter or to interfere with him in the discharge of his business; he is.
given power to take samples for analysis, not to exceed two pounds
from any package or lot of fertilizer found in the State.

These statutes, and other similar statutes, were passed to prevent
fraud being practiced in the sale of such articles, and if fraud can be·
prevented in the sale of such articles, why can not fraud be prevented
. in the sale of cotton in a like manner, when the evidence in this cause
shows that by reason of the frauds heretofore practiced the price' of
every bale grown in this State has been affected and reduced by reason
of fraudulent practices—not so much by the producers themselves, but
by some isolated ginners, who desired to increase the patronage of
their gins by giving heavy turn-outs, and the practice of nearly all
ginners to "plate" every bale of cotton they ginned, in order to gin
more cotton per day. Such laws have been sustained in other juris-
dictions. Freund on Police Power, sec. 519; State of Louisiana v.
Dupaquier, 26 L. R. A., 162; Commonwealth v. Carter, 132 Mass., 12,
and cases cited by these authorities.

Again, if evils have grown up that render the regulation of ginning
necessary and permissible under the police power, then the Legislature
would have the authority to regulate the price of ginning, if it be-
comes necessary, and to fix this as a part of the price to be paid for
the ginning of each bale of cotton. Under the police power of a State
the fact that a law requires an expense incident to the marketing of any
article be fixed, is not unconstitutional if the public welfare demands
the passage of such a law to prevent fraud and fraudulent practices.
It deprives no man of property without due process of law, and takes
no man's property for public or private use. Such law was enacted
to prevent fraud in this instance being practiced on the producer, and
to prevent any possibility of the producer practicing fraud under the
law, and deemed essential by the Legislature to accomplish these pur-
poses. With the wisdom of the law the courts have nothing to do—
that is, for the legislative branch of the government. The only ques-
tion that we can and do pass on, have such evils grown up in the gin-
ning of cotton, its preparation and preservation for market, as render
it necessary for the Legislature, under the police power, for the public
welfare, to enact a law or laws to correct the evils and legally fraudu-
lent practices shown? The evidence before us shows such a condition
of affairs, such enormous loss in the marketing of the principal product

of the State and evils connected with the system as heretofore practiced, as to authorize the Legislature to act, and whether the law will cure all the evils, or additional legislation may be rendered necessary to effectuate that purpose, is not a question to be decided by us in this case, but for future Legislatures to consider. That it will not and does not effectually cure and remedy all evils shown to exist does not render the law invalid.

We are of the opinion that the Act does not deal with two subjects in so far as it relates to the ginning and warehousing of cotton. Both of these are incident to and necessary regulations to the proper marketing of cotton, and necessary to remove the evils shown to have heretofore existed, and which entailed a very heavy loss annually in the sale of our principal product. That the law is not violative of any provision of the State or Federal Constitution, and should be upheld. And while it may not and probably will not cure all the evils shown by the testimony to exist, yet it is calculated to, intended to and will prevent some of the fraudulent practices, of which many are not guilty, yet from which all must suffer. We can not strike down a law because it does not accomplish all we think it should accomplish. If it is within the authority and power of the Legislature to enact, the law must be held valid.

Relator is remanded.                                    *Relator remanded.*

DAVIDSON, JUDGE (dissenting).—I can not concur and will write. I have concluded it would serve no useful purpose now to write at length. The Act of the Legislature is so clearly violative of the Constitution it takes no argument to show it. This seems to be so fully admitted by Judge Harper's opinion, at least in these respects: (1) That it is an omnibus marketing law or legislative Act, therefore not subject to constitutional requirement that it should not contain more than one subject. (2) That the property taken from the owner without pay is so trivial that it ought not to invalidate the Act. (3) It can not be held unconstitutional in punishing the ginner for taking the citizen's property over owner's protest. Pointedly these matters are violative of guarantees of our Constitution.

### ON MOTION TO RETAX.

#### March 8, 1916.

HARPER. JUDGE.—In the original opinion all costs incurred in this cause were taxed against relator. He has filed a motion, asking that the costs be retaxed, insisting there is no authority in law to tax any costs against him in this cause. In this contention we do not think he is correct. Article 210 of the Code of Criminal Procedure provides: "The court or judge trying the cause under habeas corpus may make such order as is deemed advisable or right concerning the cost of bringing the defendant before him, and all other costs of the proceed-

ing, awarding the same either against the person to whom the writ was directed, the person seeking relief, or may award no costs at all."

It is thus seen that, under this article of the Code, this court is given authority to tax the costs incurred either against the person having relator in custody, or against the relator. As the officer against whom the writ was directed had done no more than the law required him to do, arrest relator on a warrant issued by the proper authorities and placed in his hands, we are of the opinion no costs should be taxed against such officer.

By the affidavits on file it is made to appear that, before this cause was called for trial, Mr. Puckett, of counsel for the State, approached counsel for relator and asked him if they would agree to pay one-half of the expense of a court stenographer. This counsel for relator declined to agree to   Subsequent to this, Mr. Puckett approached counsel for relator and said he had made arrangements for payment of a stenographer. Under such circumstances we are of the opinion that such costs should not be taxed against relator, as this court had stenographers employed who could and would have reported such of the testimony as this court deemed essential to a proper disposition of the case. It is, therefore ordered that so much of the order taxing the fees of the stenographer against relator be and the same is hereby set aside, and it is ordered that such fees be, and they are, hereby taxed against no party to the same. And, inasmuch as it is apparent from the proceedings that in suing out the application for a writ of habeas corpus, relator acted from a belief that the law was unconstitutional, and, therefore, subject to no improper motive in so doing, it is ordered that so much of the order taxing the fees of the clerk of this court and the Attorney General's fees be, and the same is, hereby set aside, and it is ordered that the fees of the clerk of this court and the Attorney General be taxed against no party to the suit.

However, as the suing out of the writ rendered it necessary that the other costs be incurred,—that is, the witness fees and the sheriff's fees for summoning the witnesses, and no act of the officer having relator in charge occasioned such costs, but same were brought about by relator suing out the writ, it is the opinion of the court that the fees of the various sheriffs in summoning the witnesses and the fees of the witnesses for attending court in obedience to such process, as proven up, should be charged to relator. It is proper that such fees be paid to the witnesses and sheriffs, and the court, under the law, must exercise its discretion as to whether the officer against whom the writ was directed or relator should pay same; and, after consideration, we have arrived at the conclusion that no just reason exists why same should be taxed against the officer arresting appellant under a valid warrant of arrest, and that as said fees were occasioned by the suing out of the writ, it is ordered, adjudged and decreed by the court that the fees of the various sheriffs accruing by reason of summoning witnesses in this cause, and the fees of the various witnesses attending court in obedience

to such process, be, and the same are, hereby taxed against relator, and unless same are paid to the clerk of this court within ten days from the date of this order, that execution issue for said costs so taxed against relator.

[This case did not reach the hands of the reporter until November, 1917.—Reporter.]